**STATE ex rel. SMITH,**

v.

**INDUSTRIAL COMMISSION OF OHIO et al.**

[Cite as *State ex rel. Smith v. Indus. Comm.,* 197 Ohio App.3d 289, 2012-Ohio-1011.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 11AP–61.

Decided March 13, 2012.
</div>

290

Malek & Malek and Douglas C. Malek, for relator.

Michael DeWine, Attorney General, and Rema A. Ina, Assistant Attorney General, for respondent Industrial Commission of Ohio.

Dinsmore & Shohl, L.L.P., Michael L. Squillace, and Christen S. Hignett, for respondent the Ohio State University.

FRENCH, Judge.

{¶ 1} Relator, George Smith, filed an original action that asks this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order that denied relator's request for scheduled loss-of-use awards for the loss of his vision and hearing and to order the commission to find that he is entitled to those awards.

{¶ 2} This matter was referred to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, which includes findings of fact and conclusions of law and is appended to this decision, recommending that this court deny the requested writ. No objections have been filed regarding the magistrate's findings of fact, and we adopt them as our own.

## I. BACKGROUND

{¶ 3} As detailed in the magistrate's decision, relator suffered a work-related injury in 1995. In the course of undergoing surgery to correct the resulting allowed condition, relator suffered a brain injury. Claims were allowed for bilateral inguinal hernia, anoxic brain damage, and seizure disorder.

{¶ 4} In 1998, the commission granted relator's application for permanent total disability ("PTD"). In 2004, the commission granted his motion for scheduled loss-of-use awards for the lost use of his legs and arms.

{¶ 5} In March 2009, Bienvenido D. Ortega, M.D., examined relator and reported that relator is in a "persistent vegetative state with complete dependency and subsistence on nursing care and artificial medical means of support." Based on Dr. Ortega's report, relator moved for scheduled loss-of-use awards for the loss of his hearing in both ears and vision in both eyes.

{¶ 6} In a July 23, 2009 report, Ortega stated that "it appeared" relator "suffered from bilateral visual and hearing loss. These were felt to be part of the loss of brain function." In an August 26, 2009 addendum, Ortega answered an inquiry whether "the allowed Anoxic Brain Injury has resulted in vision and hearing loss and the mechanism by which these losses occur." In response, Ortega stated, "There is no reliable physical test or examination that could be conducted that will determine that the injured worker suffered definite vision and hearing loss as a result of the aforementioned injury." While relator's responses indicated "intact optic nerves," relator "did not respond to any testing of the visual or hearing senses because of his anoxic brain damage."

{¶ 7} In a December 28, 2009 report, Robert M. Hess, M.D., agreed that relator's hearing and vision could not be tested, due to his inability to respond to external stimuli. Hess also agreed that relator's optic nerve appeared to be functional. Nevertheless, Hess found that relator "does not process any visual stimulation that is meaningful to him or can be used to improve his life situation." In Hess's view, relator had lost both visual and auditory "function" because his brain cannot process the signals his eyes and ears receive. Hess specifically noted the Supreme Court of Ohio's decision in *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 67, 322 N.E.2d 660 (1975), in which the court stated that "[f]or all practical purposes, relator has lost his legs to the same effect and extent * * * or otherwise physically removed." Hess then stated: "I believe this applies to the visual loss and hearing loss" of relator. (By comparison, after examining relator in 2004, Hess reported that relator appeared to respond to certain words. Relator's visual acuity could not be tested, but Hess "doubt[ed] whether he has any significant cognitive and visual acuity in either eye.")

{¶ 8} Following a hearing in January 2010, a staff hearing officer ("SHO") denied relator's motion for scheduled loss awards. As to both vision and hearing loss, the SHO found that relator's requests were "not supported by medical evidence which evaluates and documents [vision and hearing] loss as a result of the allowed conditions in the claim." The SHO expressly relied on Ortega's August 2009 addendum and also noted Ortega's report of his March 2009 examination.

{¶ 9} In this mandamus action, relator argued to the magistrate that the SHO should not have relied on Ortega's August 2009 addendum, because a representative of the Ohio Bureau of Workers Compensation ("BWC") made the request for

clarification of Ortega's March 2009 report by telephone and not in writing, as R.C. 4123.651(D) requires. Relator also contended that Ortega's reports were equivocal and contradictory. Finally, relator contended that the commission should have relied on *Gassmann* and similar cases to make an award because relator had lost his hearing and vision for all practical purposes.

{¶ 10} As noted, the magistrate concluded that the commission did not abuse its discretion by relying on Ortega's reports and by finding that relator had failed to support his requests for scheduled loss awards with medical evidence.

## II.  RELATOR'S OBJECTIONS

{¶ 11} Relator presents the following objections:

(1) The [*State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, 810 N.E.2d 946] standard in its current incarnation does not apply, but this standard must be extended to apply to the use of eyesight and hearing while subsiding in a persistent vegetative state.

(2) There is clear and convincing evidence that Relator has lost the use of his eyesight and hearing and to find that there is no evidence is an abuse of discretion.

(3) *State ex rel. Lockheed Martin Corp. v. Channell,* 10th Dist. No. 05–AP– 311, 2006-Ohio-215, 2006 WL 158629, as it relates to the definition of hearing is not distinguishable from this case.

(4) The reports of Dr. Ortega are internally inconsistent and therefore, reliance upon only Dr. Ortega's Aug. 26, 2009 addendum without reconciling these internally inconsistent reports is an abuse of discretion by the Industrial Commission.

## III. DISCUSSION

### A.  First and Third Objections:  Defining the Applicable Standard

{¶ 12} In his first objection, relator contends that the standard articulated in *Alcoa, Gassmann,* and similar cases should apply to a determination whether relator, who exists in a persistent vegetative state, should receive scheduled loss awards for his lost vision and hearing. In his third objection, relator also contends that the analysis and holding in *Lockheed* should apply. To determine the appropriate standard, we decline relator's request to analyze and rely upon statutory schemes and common law applicable to circumstances outside the workers' compensation arena, including those that apply to life-support-removal situations. Instead, we turn to R.C. 4123.57(B) which authorizes specific weekly awards for the loss of a claimant's vision or hearing.

{¶ 13} "For the loss of the sight of an eye," a claimant will receive 125 weeks of compensation. R.C. 4123.57(B). "For the permanent partial loss of sight of an eye," a claimant may receive the percentage of 125 weeks BWC determines is the "percentage of vision actually lost as a result of the injury." R.C. 4123.57(B). In no case, however, "shall an award of compensation be made for less than" a 25 percent "loss of uncorrected vision." R.C. 4123.57(B). For these purposes, " '[l]oss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease." R.C. 4123.57(B).

{¶ 14} For the loss of hearing, a claimant may receive an award only if the claimant has suffered "permanent and total loss of hearing" in one or both ears. R.C. 4123.57(B). "For the permanent and total loss of hearing of one ear," the award is equivalent to 25 weeks. R.C. 4123.57(B). "For the permanent and total loss of hearing," the award is 125 weeks. R.C. 4123.57(B).

{¶ 15} The award provisions for the loss of an appendage refer to "the loss of" that appendage or a specified portion of an appendage. R.C. 4123.57(B). The Supreme Court of Ohio has interpreted these loss-of-appendage ·provisions to allow an award not only where an appendage has been severed or amputated, but also where a claimant has lost the use of an appendage for all practical purposes. *See Alcoa; Gassmann;* and *State ex rel. Walker v. Indus. Comm.,* 58 Ohio St.2d 402, 390 N.E.2d 1190 (1979).

{¶ 16} In *Alcoa,* the Supreme Court recognized that a claimant could recover for the loss of an arm even where residual use of the arm remained. Citing a Pennsylvania case with approval, the court stated that " 'it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes.' " *Alcoa,* 102 Ohio St.3d 341, 2004-Ohio-3166, 810 N.E.2d 946, at ¶ 13, quoting *Curran v. Walter E. Knipe & Sons, Inc.,* 185 Pa.Super. 540, 547, 138 A.2d 251 (1958). Similarly, in *State ex rel. Kroger Co. v. Johnson,* 128 Ohio St.3d 243, 943 N.E.2d 541, 2011-Ohio-530, ¶ 15, the court stated that the retention of "residual function" in a claimant's hand did not automatically defeat his claim for loss of use. Rather, "the pivotal question is how much function remains." *Id.*

{¶ 17} R.C. 4123.57(B) requires different proof to support a loss of vision or hearing, however. As to vision, the statute allows recovery for a total or permanent partial "loss of sight." R.C. 4123.57(B). If the loss is less than total, BWC must determine the percentage of the loss and grant an award equal to that percentage of the possible 125–week award. Under no circumstances may a claimant recover for a loss of less than 25 percent. In contrast to an award that may be granted under *Alcoa* for the loss of use of an appendage, an award may be granted for loss of vision only where (1) the loss is total or (2) the loss is partial, more than 25 percent, and identified by a specific percentage.

{¶ 18} As to hearing, the statute allows recovery only for permanent and total loss of hearing in one or both ears; recovery for a residual or partial loss of hearing is unavailable. In *State ex rel. Dingess v. Indus. Comm.*, 82 Ohio St.3d 31, 693 N.E.2d 784 (1998), the Supreme Court of Ohio affirmed this principle that a hearing loss must be total. In doing so, the court compared the recovery available for a leg injury to a recovery available for hearing loss, the latter of which requires a "statutory threshold level of impairment." *Id.* at 34, comparing *State ex rel. Maurer v. Indus. Comm.*, 47 Ohio St.3d 62, 547 N.E.2d 979 (1989). "R.C. 4123.57(B) expressly limits compensation to those suffering a permanent and total hearing loss. Therefore, claimant Maurer's ability to receive a permanent partial disability award in *Maurer* [for the partial loss of a leg] does not translate into a similar ability by claimant Dingess [for the partial loss of hearing] to do so in this case." *Dingess* at 34.

{¶ 19} Nevertheless, we acknowledge that within these confines, the proof necessary to show a *total* loss of vision or hearing under R.C. 4123.57(B) remains somewhat flexible. In *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2008-Ohio-541, 883 N.E.2d 372, ¶ 4, for example, the Supreme Court upheld a scheduled loss award for a claimant's loss of vision where the medical report showed that he had lost " 'at least 75 to 80% of his vision' " in one eye. Rejecting the employer's argument that this equated to only a partial loss of vision in one eye, a divided court upheld the commission's factual determination that the claimant suffered a "total loss of vision" in that eye because the same report found that the claimant was " 'legally blind,' " a finding the commission equated to " 'the loss of the sight of an eye' " for purposes of R.C. 4123.57(B). *Id.* at ¶ 1, 5. In *State ex rel. Kincaid v. Allen Refractories Co.*, 114 Ohio St.3d 129, 2007-Ohio-3758, 870 N.E.2d 701, the Supreme Court reversed the denial of a claimant's application for PTD where that claimant had received a scheduled loss award for the total loss of his vision, even though he lost his vision only temporarily, up to nine 45–minute intervals per week.

{¶ 20} Similarly, in *State ex rel. Sheller–Globe Corp. v. Indus. Comm.*, 66 Ohio St.2d 51, 419 N.E.2d 1084 (1981), the Supreme Court affirmed a decision of this court, which upheld the commission's factual determination that a hearing loss of 87 to 100 percent was some evidence that the claimant had suffered a permanent and total loss of hearing for purposes of former R.C. 4123.57(C), now R.C. 4123.57(B). The record contained medical reports indicating different percentages of hearing loss, up to and including a total loss, but also indicating that the claimant could hear or read lips in some situations to allow comprehension. Within that context, in a decision upholding the commission's award, the majority stated:

[T]o ascertain the true meaning of the words "total loss of hearing" as used in the statute, of prime importance is the meaning of the word "hearing" as used in the statute. Within the context of the statute, the word "hearing" connotes the ability to comprehend everyday speech. In other words, hearing connotes the ability to comprehend the spoken word for the purpose of communication with others. The mere fact that a person is able to discern certain sounds of certain frequencies at certain intensities does not prevent a finding of a total loss of hearing if the person is unable to hear and comprehend the spoken word even when spoken extremely loud. In other words, hearing within the context of the statute connotes the ability not just to discern sounds but also the ability to comprehend and give meaning to the sounds. Thus, there is a total loss of hearing where a person is completely unable to gain information through oral conversation by use of his auditory organs.

*State ex rel. Sheller–Globe Corp. v. Indus. Comm.,* 10th Dist. No. 80AP–194, 1980 WL 353639 (Aug. 21, 1980). In support of this analysis, this court cited decisions from courts in other states that relied on a determination that the claimant had lost hearing for all practical purposes to support an award for a total loss of hearing. *See, e.g., Vouniseas' Case,* 3 Mass.App.Ct. 133, 324 N.E.2d 916 (1975); *Workmen's Comp. Appeal Bd. v. Hartlieb,* 465 Pa. 249, 348 A.2d 746 (1975); *Pilkanis v. Leesona Corp.,* 101 R.I. 494, 224 A.2d 893 (1966); and *Shipman v. Emps. Mut. Liab. Ins. Co.,* 105 Ga.App. 487, 125 S.E.2d 72 (1962).

{¶ 21} In addition, this court cited *Walker,* a loss-of-appendage case in which the Supreme Court held that the phrase "loss of both legs" as used in former R.C. 4123.57(C) included loss of use of both legs. Noting that former R.C. 4123.57(C) must be liberally construed in favor of employees, this court held that "a strict construction requiring that one have no hearing of any nature to constitute total loss of hearing would be inconsistent with this statutory mandate." *Sheller–Globe,* 10th Dist. No. 80AP–194.

{¶ 22} Without specifically agreeing with any of this court's analysis, the Supreme Court in *Sheller–Globe* affirmed this court's judgment in a per curiam opinion. In doing so, the court held that the commission had not abused its discretion by finding the claimant entitled to an award of benefits. *See also Lockheed* (adopting without objection magistrate's decision that audiologist's report indicating that claimant had lost ability to communicate with the use of his right ear equated to total loss of hearing in that ear for purposes of R.C. 4123.57(B)); *Kingry v. Complete Gen. Constr. Co.,* 10th Dist. No. 84AP–109, 1985 WL 9920 (Mar. 26, 1985) (relying on this court's analysis in *Sheller–Globe* and holding that commission did not abuse its discretion by denying an award under former R.C. 4123.57 for total loss of hearing where medical report found that claimant was not totally deaf).

{¶ 23} This precedent leads us to conclude that this court and the Supreme Court have interpreted "total loss" of vision or hearing under R.C. 4123.57(B) to mean something other than a clinical finding of a 100 percent loss based solely on audiological findings. Instead, while not relying expressly on the for-all-practical-purposes standard articulated in loss-of-appendage cases like *Alcoa*, this court and the Supreme Court of Ohio have held that the commission does not abuse its discretion by awarding scheduled loss benefits for a total loss of vision or hearing where the medical evidence considers the practical application of clinical or other data showing a loss of 100 percent or less. Accordingly, we sustain in part relator's first and third objections.

## B. Second and Fourth Objections: The Medical Evidence

{¶ 24} In support of scheduled loss awards for the total loss of his vision and hearing, relator submitted the report of Hess. In his report, Hess relied on the loss-of-appendage standard articulated in *Gassmann* and concluded that relator had lost his vision and hearing for all practical purposes.

{¶ 25} As to vision, Hess acknowledged that relator had "an intact pupillary response to light. However, because of his cerebral anoxia and brain depth, no significant relay of the impulses past the brain stem to the visual cortex on either side exists. Therefore, this can be considered also a loss of function as if the effector organ has been traumatically removed." As to relator's hearing, Hess stated that he does not believe that relator "hears or is able to receive communication that he can respond to, also because of loss of efferent pathways from the mid brain and auditory nerve to the auditory cortex bilaterally in the posterior superior temporal lobes." Based on the precedent of this court and the Supreme Court of Ohio, we conclude that Dr. Hess's report constituted some evidence of a total loss of vision and hearing. Because the commission rejected Hess's report as evidence, a new adjudication is necessary.

{¶ 26} Having concluded that the commission must conduct a new adjudication of relator's application for scheduled loss awards, we consider whether the report and addendum of Ortega constitute some evidence on which the commission may rely. As an initial matter, we agree with the magistrate that Ortega's report and addendum are not internally inconsistent, and we reject relator's unfounded speculation that the content of the addendum is the result of a telephone request, as opposed to a written one. Ortega appears to agree that relator "suffered from bilateral visual and hearing loss" as a result of the "loss of brain function." Nevertheless, Ortega concluded that relator had not suffered a total loss of vision and hearing for purposes of R.C. 4123.57(B), because no reliable test exists to determine "definite vision and hearing loss," which we interpret to mean a specific percentage of loss without application to practical

considerations of vision and hearing. We have already determined, however, that such a finding is unnecessary for a determination that a claimant has suffered a total loss for purposes of R.C. 4123.57(B). Because Ortega might have reached a different conclusion if he had used the appropriate standard, we return the matter to the commission for further consideration or clarification of Dr. Ortega's report and addendum during the new adjudication. *See State ex rel. Woodhull v. Indus. Comm.*, 10th Dist. No. 10AP–821, 2011-Ohio-4921, 2011 WL 4477275, ¶ 6–10, relying on *Kroger*, 128 Ohio St.3d 243, 2011-Ohio-530, 943 N.E.2d 541 (returning matter to commission for further consideration where medical expert relied on wrong standard for purposes of determining scheduled loss award for loss of thumb).

{¶ 27} For all these reasons, we sustain relator's second objection and overrule relator's fourth objection.

## IV.  CONCLUSION

{¶ 28} Having conducted an independent review of this matter, we adopt the magistrate's findings of fact as our own. As to the magistrate's conclusions of law, we sustain, in part, relator's first and third objections, sustain relator's second objection, and overrule relator's fourth objection. In accordance with the foregoing opinion, we issue a writ of mandamus ordering the commission to conduct a new adjudication of relator's applications for scheduled loss awards for a total loss of vision and hearing under R.C. 4123.57(B).

*Writ granted.*

KLATT and TYACK, JJ., concur.

————

APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

MAGISTRATE'S DECISION

Rendered on September 22, 2011

IN MANDAMUS

BROOKS, Magistrate.

{¶ 29} Relator, George Smith, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order that denied his request for scheduled loss-of-use awards for loss of both vision and hearing and asking the commission to find that he is entitled to those scheduled loss awards.

### Findings of Fact

{¶ 30} 1. Relator sustained a work-related injury on December 28, 1995 while pushing a heavy weight at work.

{¶ 31} 2. Relator's claim was initially allowed for "bilateral inguinal hernia."

{¶ 32} 3. Relator underwent elective surgery to repair his inguinal hernia on March 8, 1996. Unfortunately, certain events occurred during the procedure that led to a tragic result. Ultimately, his workers' compensation claim would be allowed for the following additional conditions: "anoxic brain damage; seizure disorder."

{¶ 33} 4. The April 18, 2007 physician review by William O. Smith, M.D., provides the most complete and relevant narrative regarding the tragic consequences. With regard to the events that occurred post-surgery, Dr. Smith stated:

[D]uring the [injured worker's] operation it was noted that he had episodes where he would have O2 saturation drop from 99% to 88% and then back up to 99% without any change in his mechanical ventilation settings. Post operative he was very agitated and extubated himself. * * * [H]e went into cardiac arrest requiring defibrillation three times. * * *

* * * His neurologic status he was unresponsive to painful stimuli. * * * After several days he was noted to have corneal reflex, spontaneous breathing but he did not respond to painful stimuli. It was felt that he had suffered anoxic brain injury during his cardiopulmonary arrest. The neurologist felt that [if] his clinical vegetative state persisted beyond 2 months the likelihood of recovery from his anoxic insult would be approximately 0%. He was started on tube feedings and antibiotics. * * *

April 29, 1996, a report of discharge summary from Don Hull. * * * [Injured worker] had periodic episodes of agitation while there and he was treated with Haldol. He had developed some rigidity as a result of his receiving Haldol and was put on Cogentin. His subacute rehabilitation stay was complicated by depression and poor sleep. Pre-morbidly he was independent in all areas. He is right hand dominant. He was receiving tube feedings[.] * * * He was incontinent of bowel and bladder and was able to ask for a bedside commode or bed pan as needed. He required assistance to perform activities of daily living and dressing. He had blurred vision which compromised his ability to take

care of these things. His mobility was also impaired as he required assistance to perform transfers and was completely dependent on a wheelchair for his locomotion. Cognitively his function was impaired and marked by decreased orientation, impaired memory, and dysarthria. He was however able to communicate basic wants and needs. It was felt that some component of apraxia was also impairing his motor function. * * *

His hospital course showed that he remained incontinent. He remained on tube feedings. * * * After several days admission he was noted to have persistent and involuntary myoclonic activity which was felt to be secondary to his anoxic brain injury. Treatment * * * allowed significant improvement in the area of gait training and his over all myoclonic activity decreased considerably.

Due to his slow progress, he was sent to a prolonged subacute level rehabilitation facility on May 22, 1996. Before discharge his visual acuity was checked and he was found to have reduced visual acuity. It was difficult to assess because of his agitation. * * *

On January 10, 1998, a report by John Kelly Brennan, MD stated the [injured worker] was delusional, agitated, and combative, thrashes around, and is at risk for injury to himself and others. He is unlikely to respond sufficiently and should be considered permanently and totally disabled from any meaningful opportunity for sustained remunerative employment.

June 11, 2001, a Physician Review by David R. Duncan, DO. * * * As a consequence of the anoxic brain injury a feeding tube has been placed through the abdomen into the stomach and prolonged intubation with ventilatory support was required. Rehab facility included occupational therapy and speech therapy and particularly addressed towards swallowing difficulty. * * *

January 19, 2003, Admission Note from Ohio State University Medical Center [s]hows [injured worker] is a 53–year–old African American Male brought to the Emergency Department by wife from St. Angelo's group home after he had been assaulted by another resident. * * * Patient was sleeping and the assailant punched him in the face several times. * * * He was observed for several days and able to be discharged back to the nursing home.

February 13, 2004, Independent Medical Examination by Robert H. Hess, MD, Neurological consultant. He states that it was his belief the [injured worker] now has total loss of function of multiple parts of his body as a direct result of anoxic brain damage particularly to his right upper and lower extremity and left upper and lower extremity. These body parts are totally useless since June of 1996. He also has no use of his fingers and thumbs. Dr. Hess has a reasonable degree of medical certainty that these things will not significantly improve for the [injured worker].

\* \* \*

August 22, 2006, Hospital Summary from Ohio State University Medical Center[.] \* \* \* [Injured worker] transferred from the ECG after prolonged seizure activity.

{¶ 34} 5. Relator was granted permanent total disability in an order mailed September 24, 1998.

{¶ 35} 6. Relator filed a motion seeking the scheduled loss-of-use award for the loss of use of his arms, fingers, and hands as well as his legs, feet, and bilateral great toes.

{¶ 36} 7. Relator's motion was heard before a district hearing officer ("DHO") on May 3, 2004, and the motion was granted in part and denied in part.

{¶ 37} 8. The DHO's order would be affirmed in its entirety following a hearing before a staff hearing officer ("SHO") on June 21, 2004. Specifically, the SHO granted the motion for scheduled loss of use of both arms and both legs, but denied the request for scheduled loss of use for hands, fingers, feet, and bilateral great toes. Specifically, the SHO's order provides:

The Staff Hearing Officer concurs with the District Hearing Officer in finding that the injured worker has sustained a total loss of use of his right arm, left arm, his right leg, and his left leg \* \* \* as a result of anoxic brain damage that is allowed in this claim. The anoxic brain damage was the unfortunate result of a hernia surgery the injured worker underwent on 03/08/1996. The Staff Hearing Officer bases this finding on the 02/13/2004 examination report of Dr. Hess. The Staff Hearing Officer finds that the District Hearing Officer properly relied on the [*State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, 810 N.E.2d 946] case in awarding the injured worker, under Revised Code section 4123.57(B), the total loss of the right arm for 225 weeks, the loss of the left arm for 225 weeks, for the loss of the right leg for 200 weeks and for loss of the left leg for 200 weeks.

The Staff Hearing Officer concurs with the District Hearing Officer's decision to award the above on a consecutive weekly basis (rather than concurrent) from 02/26/2002 forward. Like the District Hearing Officer, the Staff Hearing Officer finds that it is the policy of the Industrial Commission to pay such awards consecutively rather than concurrently. As noted by the District Hearing Officer, in a similar case involving loss-of-use awards for all four extremities, the court held in *Swallow v. Indus. Comm.* (1988), 36 Ohio St.3d 55, 521 N.E.2d 778, that the Industrial Commission's policy of awarding such benefits consecutively does not constitute an abuse of its discretion.

The Staff Hearing Officer further concurs with the District Hearing Officer's rationale and decision with regard to the start date of 02/26/2002 in reliance on

the language of Revised Code 4123.52, which provides in pertinent part that the "commission shall not make * * * any finding, or award which shall award compensation for a back period in excess of two years prior to the date of the application therefore." As noted by the District Hearing Officer, the injured worker's application for the scheduled loss benefits was filed on 02/26/2004. Therefore, payment of such benefits cannot extend to periods prior to 02/26/2002. The Staff Hearing Officer agrees with the District Hearing Officer's analysis of the *Adams v. Aluchem* [104 Ohio St.3d 640, 2004-Ohio-6891, 821 N.E.2d 547] case. This case is distinguishable by virtue of the fact that it involved payment of statutory permanent total disability benefits under Revised [C]ode 4123.58, not loss of use benefits under Revised Code 4123.57.

Lastly, the Staff Hearing Officer concurs with the last portion of the District Hearing Officer's denial of payment of awards for the total loss of use of the right and left thumbs; right and left first fingers; right and left second fingers; right and left fourth findings; right and left hands; right and left great toes; and right and left feet in reliance on *State ex rel. Samkas v. Indus. Comm.* (1982), 70 Ohio St.2d 279, 437 N.E.2d 288, and *State ex rel. Cook v. Zimpher* (1985), 17 Ohio St.3d 236, 479 N.E.2d 263. Like the District Hearing Officer, the Staff Hearing Officer is not persuaded that those decisions have been overruled by *State ex rel. Thomas v. Indus. Comm.* (2002), 97 Ohio St.3d 37, 776 N.E.2d 62.

{¶ 38} 9. Bienvenido D. Ortega, M.D., conducted a physical examination of relator in March 2009. In his March 26, 2009 report, Dr. Ortega noted the following:

The wife of the examinee, Mary, was present during the entire examination. Mr. Smith was sitting in a wheelchair in the TV room when my assistant Thelma Ortega and myself arrived. He was wheeled by a nurse's aide to his room for privacy of the examination.

Mr. Smith was not able to communicate in any way. Mary Smith provided some history. The file review report by Dr. William O. Smith, dated April 18, 2007 was also used in preparation for this report.

* * *

He has required regular nursing care since then with tube feedings through a PEG tube, urinary catherization for urinary incontinence. He developed severe muscular rigidity and episodes of agitation.

Interestingly, Dr. Smith's review indicated that Mr. Smith had periods when he was supposedly was [sic] able to ask for a bed pan and nursing assistance. There was a report of Dr. John Kelly Brennan who reported on June 11, 2001, that Mr. Smith was delusional, agitated, and combative. Dr. Brennan opined that Mr. Smith was at risk to [sic] injury to himself and others and was

unlikely to respond sufficiently. He was considered at that point to be permanently and totally disabled from any meaningful opportunity for sustained remunerative employment.

\* \* \*

He is put in a harness to get him up into a wheelchair every morning. A harness is used also along with two people to get him showered. Usually male aides are required to help him as the females are afraid of his agitation and episodes of acting "mad and becoming disruptive."

Fluid and nutrition are by artificial means. He requires intermittent regular urinary catherization. Medications in the nursing home include: Ativan, Amlodipine, Acetaminophen, Baclofen, Effexor, Uroneg, Valproic Acid, Iron, Hydralazine, Metaprolol, Oneprazole, Syntroid and Zeprexyn.

\* \* \*

He is seated in a wheelchair with restraints. He wears a right forearm and hand brace and a long left leg brace.

*There is no comprehension of language, with intermittent wakefulness. Pupils react to bright light. He appears to squint constantly but gaze is fixed*. There are gross tremors of all extremities especially the right leg that shakes constantly. He is constantly making chewing facial movements.

All extremities are spastic and contractured in flexion. Both wrists are at 90 degree flexion contracture. The left knee is contracted at 30 degrees in flexion.

*Mr. Smith is in a persistent vegetative state* with complete dependency and subsistence on nursing care and artificial medical means of support. Using Table 13–2 on page 309 class 4, there is 70% impairment of the Whole Person.

A previous award of 20% on this claim has already been awarded.

The combined effects would be 76%.

(Emphases added.)

{¶ 39} 10. It was because Ortega indicated that relator was in a persistent vegetative state that a motion for total loss of hearing and vision was filed. Although the motion is not contained in the stipulation of evidence, pursuant to the DHO's order of November 13, 2009, it is apparent that relator filed a motion seeking loss of use of both eyes and both ears in June 2009.

{¶ 40} 11. After relator filed the motion for total loss of vision and hearing, the Ohio Bureau of Workers' Compensation ("BWC") specifically asked Ortega whether relator's claim should be additionally allowed for bilateral vision loss and bilateral hearing loss. In a report dated July 23, 2009, Ortega opined as follows:

The physical examination on March 26, 2009 revealed no comprehension of language, no response to verbal questions and stimulation, with intermittent

wakefulness. The pupils reacted to bright light (which signifies intact optic nerves). He appeared to squint constantly but gaze was fixed. On examination, it appeared that he suffered from bilateral visual and hearing loss. These were felt to be part of the loss of brain function.

\* \* \*

\* \* \* The conditions referenced \* \* \* were caused by a flow-through from the industrial injury, during the hernia repair, a procedure made necessary to correct the allowed condition of inguinal hernia. The conditions are part of the anoxic brain damage and seizure disorder that resulted from this August 2006 incident.

It was Ortega's opinion that any loss of vision or hearing was part of the already allowed condition of anoxic brain damage.

{¶ 41} 12. Ortega authored an addendum, dated August 26, 2009, in response to a "recent telephone conversation regarding your request regarding as to whether the allowed Anoxic Brain Injury has resulted in vision and hearing loss and the mechanism by which these losses occur." Ortega responded:

*It is my opinion within a reasonable degree of medical certainty, that there is no reliable physical test or examination that could be conducted that will determine that the injured worker suffered definite vision and hearing loss as a result of the aforementioned injury.* During the examination of 3/22/2009, there was pupillary response to indicate intact optic nerves. The claimant did not respond to any testing of the visual or hearing senses because of his anoxic brain damage.

(Emphasis added.)

{¶ 42} 13. Thereafter, relator provided the December 28, 2009 report of Robert M. Hess, M.D., who was specifically asked to answer the following question:

You have specifically asked me whether this claimant has sustained a loss of use of his vision and hearing due to anoxic brain damage. You have explained to me loss of use encompasses not only loss by severance but also loss of use if an appendage, for example, is lost to the same extent, but for all practical purposes as if the appendage had been severed.

Thereafter, Dr. Hess opined as follows:

*I agree that Mr. Smith's hearing and vision cannot be tested due to the claimants' [sic] inability to respond to external stimuli. I also agree that the optic nerve, with its central connections in the mid brain which activate a reactive pupil to light and is functional; however, just because that reflex exists, he does not process any visual stimulation that is meaningful to him or can be used to improve his life situation.*

He was examined by me on 12–28–09 and there is no significant change in neurological function from the examination that I previously recorded on him on 2–13–04. I believe that this substantiates my opinion at that time that on 12–28–09, there has been no significant improvement. It was my belief on 2–13–04 that, to a reasonable degree of medical certainty, his disability was 100%. I believed that his condition then and his status at that time was permanent and would not significantly improve.

Clinical testing by me on 12–28–09 revealed him to be a well developed black male who was in constant and moderate severe distress. He could not respond to the spoken word or to threaten visual stimuli. Significant muscle contractions in the right upper extremity were present. Pathological reflexes were present in the left upper extremity. On the thalamic level only he had painful withdrawal response stimulating the left lower extremity. His deep reflexes were quite active in the lower extremities.

Once again, it is my opinion that he is permanently and totally disabled and remains in a vegetative existence.

*As far as the visual loss is concerned, he has an intact pupillary response to light. However, because of his cerebral anoxia and brain depth, no significant relay of the impulses past the brain stem to the visual cortex on either side exists. Therefore, this can be considered also a loss of function as if the effector organ has been traumatically removed. Secondly, as far as auditory function is concerned, I do not believe that he hears or is able to receive communication that he can respond to, also because of loss of efferent pathways from the mid brain and auditory nerve to the auditory cortex bilaterally in the posterior superior temporal lobes.* This also fits this diagnosis and meets the courts standards for loss of use as cited in the cases sent to me for review. I have reviewed the opinion of Justice Paul W. Brown's statement in [State ex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64], supra, at Page 67 [322 N.E.2d 660] where in it is stated "[f]or all practical purposes, relator has lost his legs to the same effect and extent [as if they had been amputated] or otherwise physically removed." I believe this applies to the visual loss and hearing loss of Mr. George Smith. I agree with the examiner for the BWC that the pupillary reflex to light is intact, but this is limited to the mid brain and its connections. It does not relate to any ascendant function into the cerebral cortex.

(Emphases added.)

{¶ 43} 14. Relator's motion was heard before a DHO on November 13, 2009. The DHO denied relator's motion in its entirety, stating:

The District Hearing Officer denies the Injured Worker's C–86 Motion, filed 06/22/2009. The District Hearing Officer denies the requested compensation for LOSS OF USE.

The District Hearing Officer specifically DENIES the following: Scheduled Loss/Loss Of Use—LOSS OF USE OF THE LEFT EAR (HEARING) and Scheduled Loss/Loss Of Use—LOSS OF USE OF THE RIGHT EAR (HEARING).

The District Hearing Officer has carefully considered all evidence in the claim file and presented at hearing. The Injured Worker has not provided supportive medical evidence for the requested Scheduled Loss Of Use of Hearing in either ear.

The District Hearing Officer specifically DENIES the following: Scheduled Loss/Loss Of Use—LOSS OF USE OF THE LEFT EYE (SIGHT) and Scheduled Loss/Loss Of Use—LOSS OF USE OF THE RIGHT EYE (SIGHT).

For this portion of the order of the District Hearing Officer relies on the reports of Dr. Ortega dated 03/26/2009 and 08/26/2009.

(Emphases sic.)

{¶ 44} 15. Relator appealed and the matter was heard before an SHO on January 5, 2010. The SHO affirmed the prior DHO's order and denied the motion. The SHO did provide a better explanation, stating:

The Injured Worker's request for an award for a loss of use of the left and right ear (hearing) remains denied. The Staff Hearing Officer finds that the request is not supported by medical evidence which evaluates and documents a right and left hearing loss as a result of the allowed conditions in the claim.

The Injured Worker's request for an award for a loss of use of the right and left eye (sight) remains denied. The Staff Hearing Officer finds that this request is not supported by medical evidence which evaluates and documents a right and left vision loss as a result of the allowed conditions in the claim.

The Staff Hearing Officer relies upon the medical report of Dr. Ortega dated 08/26/2009. Dr. Ortega noted that during his 03/22/2009 examination of the Injured Worker, there was "pupillary response to indicate intact optic nerve. The Injured Worker did not respond to any testing of the visual or hearing senses because of his anoxic brain damage." In addition, Dr. Ortega opined "that there is no reliable physical test or examination that could be conducted that will determine that the Injured Worker suffered definite vision and hearing loss as a result of the aforementioned injury." The Staff Hearing Officer notes that the Injured Worker's motion is not supported by any specific objective hearing or visual testing.

{¶ 45} 16. Relator's further appeal was refused by order of the commission mailed January 27, 2010.

{¶ 46} 17. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law

{¶ 47} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 48} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 228 N.E.2d 631. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.* (1986), 26 Ohio St.3d 76, 497 N.E.2d 70. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.* (1987), 29 Ohio St.3d 56, 505 N.E.2d 962. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact-finder. *State ex rel. Teece v. Indus. Comm.* (1981), 68 Ohio St.2d 165, 429 N.E.2d 433.

{¶ 49} R.C. 4123.57 provides for awards of permanent-disability compensation. Pursuant to section (A), the commission must determine the percentage of the injured worker's permanent disability resulting from the allowed conditions as evidenced from medical or clinical findings reasonably demonstrable. With regard to certain specific losses, the legislature has already determined the compensation payable to an injured worker who demonstrates a total loss of use of various body parts in section (B).[1]

{¶ 50} In order to qualify for a loss-of-use award for any appendage, the injured worker must present medical evidence demonstrating that for all intents and purposes, the injured worker has lost the use of that appendage. *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.*, 102 Ohio St.3d 341, 2004-Ohio-3166, 810 N.E.2d 946.

{¶ 51} In *Alcoa*, at ¶ 10, the court set forth the historical development of scheduled awards for loss of use under R.C. 4123.57(B) as follows:

---

1. R.C. 4123.57(B) sets forth the compensation payable to an injured worker who demonstrates a total loss of use of his or her first, second, third, fourth, and fifth fingers, as well as losses of certain phalanges; hand; arm; and great toe, toe other than great toe, as well as losses of great-toe phalanges; foot; and leg.

Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970s, two cases—*State ex rel. Gassmann v. Indus. Comm.* (1975), 41 Ohio St.2d 64, 70 O.O.2d 157, 322 N.E.2d 660, and *State ex rel. Walker v. Indus. Comm.* (1979), 58 Ohio St.2d 402, 12 O.O.3d 347, 390 N.E.2d 1190—construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. *Gassmann* and *Walker* both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed." *Gassmann*, 41 Ohio St.2d at 67, 70 O.O.2d 157, 322 N.E.2d 660; *Walker*, 58 Ohio St.2d at 403–404, 12 O.O.3d 347, 390 N.E.2d 1190.

{¶ 52} In *Alcoa*, the claimant, Robert R. Cox, sustained a left-arm amputation just below his elbow. Due to continuing hypersensitivity at the amputation site, Cox was prevented from ever wearing a prosthesis. Consequently, Cox filed a motion seeking a scheduled loss-of-use award for the loss of use of his left arm.

{¶ 53} Through videotape evidence, Alcoa established that Cox could use the remainder of his left arm to push open a car door and to tuck paper under his arm. In spite of this evidence, the commission granted Cox an award for the loss of use of his left arm.

{¶ 54} Alcoa filed a mandamus action which this court denied. Alcoa appealed as of right to the Supreme Court of Ohio.

{¶ 55} Affirming this court's judgment and upholding the commission's award, the *Alcoa* court explained, at ¶ 10–15:

Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.

Alcoa's interpretation is unworkable because it is impossible to satisfy. *Walker* and *Gassmann* are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight—and hence an aid to balance—that an

amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar—as here—scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of *Gassmann* and *Walker.*

Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist us here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:

"Generally, the 'all practical intents and purpose' test requires a more crippling injury than the 'industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes." *Curran v. Walter E. Knipe & Sons, Inc.* (1958), 185 Pa.Super. 540, 547, 138 A.2d 251.

This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:

"It is my belief that given the claimant's residual hypersensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."

{¶ 56} Relator argues that *Alcoa* applies here; however, it does not. With regard to losses of both sight and hearing, R.C. 4123.57(B) provides a different standard. Specifically, R.C. 4123.57(B) provides:

(B) In cases included in the following schedule the compensation payable per week to the employee is the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code per week and shall continue during the periods provided in the following schedule:
* * *
For the loss of the sight of an eye, one hundred twenty-five weeks.

For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the

percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. "Loss of uncorrected vision" means the percentage of vision actually lost as the result of the injury or occupational disease.

For the permanent and total loss of hearing of one ear, twenty-five weeks; but in no case shall an award of compensation be made for less than permanent and total loss of hearing of one ear.

For the permanent and total loss of hearing, one hundred twenty-five weeks; but, except pursuant to the next preceding paragraph, in no case shall an award of compensation be made for less than permanent and total loss of hearing.

{¶ 57} First, considering his loss of vision, relator was required to present medical evidence that he had sustained more than a 25 percent loss of uncorrected vision. As R.C. 4123.57(B) provides, " '[l]oss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease." With regards to relator's vision, relator submitted reports from Dr. Hess.

{¶ 58} His first report, dated February 13, 2004, was written following his physical examination of relator. The purpose of the examination was to determine whether "Mr. Smith may qualify for a scheduled loss of use award * * * [and] whether this loss is total, or partial, and whether this loss is permanent" as it related to relator's extremities (appendages and not vision or hearing). In that report, Hess noted that relator's "[p]upils are possibly, scantly reactive" and that there was "[n]o response to threatening visual stimulus."

{¶ 59} The record also contains the December 28, 2009 report of Hess wherein he was asked to answer the following question:

You have specifically asked me whether this claimant has sustained a loss of use of his vision and hearing due to anoxic brain damage. You have explained to me loss of use encompasses not only loss by severance but also loss of use if an appendage, for example, is lost to the same extent, but for all practical purposes as if the appendage had been severed.

In response to that question, Hess said:

*I agree that Mr. Smith's hearing and vision cannot be tested due to the claimants'* [sic] *inability to respond to external stimuli. I also agree that the optic nerve, with its central connections in the mid brain which activate a reactive pupil to light and is functional; however, just because that reflex exists, he does not process any visual stimulation that is meaningful to him or can be used to improve his life situation.*

\* \* \*

*As far as the visual loss is concerned, he has an intact pupillary response to light. However, because of his cerebral anoxia and brain depth, no significant relay of the impulses past the brain stem to the visual cortex on either side exists. Therefore, this can be considered also a loss of function as if the effector organ has been traumatically removed.* \* \* \*

{¶ 60} The record also contains several reports from Dr. Ortega. In his March 26, 2009 report, Ortega noted the following concerning relator's vision: "Pupils react to bright light. He appears to squint constantly but gaze is fixed."

{¶ 61} Thereafter, Ortega was asked to provide his opinion as to whether or not relator had sustained bilateral vision loss and bilateral hearing loss. In his July 23, 2009 report, Ortega stated:

The physical examination on March 26, 2009 revealed no comprehension of language, no response to verbal questions and stimulation, with intermittent wakefulness. The pupils reacted to bright light (which signifies intact optic nerves). He appeared to squint constantly but gaze was fixed. On examination, it appeared that he suffered from bilateral visual and hearing loss. These were felt to be part of the loss of brain function.

\* \* \*

\* \* \* The conditions referenced \* \* \* were caused by a flow-through from the industrial injury, during the hernia repair, a procedure made necessary to correct the allowed condition of inguinal hernia. The conditions are part of the anoxic brain damage and seizure disorder that resulted from this August 2006 incident.

It is my opinion within a reasonable degree of medical probability that the request for the additional allowance for bilateral vision loss and bilateral hearing loss be denied as this is already included in the allowed condition of anoxic brain damage and seizure disorder.

{¶ 62} Thereafter, in response to a telephone conversation regarding whether the anoxic brain damage had resulted in the vision and hearing loss, Ortega stated:

*[T]here is no reliable physical test or examination that could be conducted that will determine that the injured worker suffered definite vision and hearing loss as a result of the aforementioned injury.* During the examination of 3/22/2009, there was pupillary response to indicate intact optic nerves. The claimant did not respond to any testing of the visual or hearing senses because of his anoxic brain damage.

{¶ 63} In denying relator's request for scheduled loss of use of vision of both eyes, the SHO relied on the March 22 and August 26, 2009 reports of Ortega.

The SHO correctly noted that Ortega indicated that what testing he could do indicated that the optic nerve was intact. Ortega indicated that the problem was the anoxic brain damage. Essentially, it appears that relator's eyes gather visual information; however, due to the anoxic brain damage, relator's brain does not process the signal.

{¶ 64} Because all the evidence presented establishes that there is no way to actually test relator's vision and, consequently, no way to determine what loss, if any, he has sustained, the commission denied the motion. Relator was not able to satisfy the requirements of R.C. 4123.57(B) relating to vision loss. The magistrate finds that this was not an abuse of discretion.

{¶ 65} Similarly, with regard to relator's hearing loss, the medical evidence does not support a finding that relator has permanent and total loss of hearing in both ears. Even Hess acknowledged that any hearing loss is *"because of loss of efferent* [2]*pathways from the mid brain and auditory nerve to the auditory cortex bilaterally in the posterior superior temporal lobes."* Further, as Ortega noted in his August 26, 2009 report, not only is there no reliable test or examination which could be conducted to determine whether relator suffered definite vision loss, likewise there is no reliable test or examination that could be conducted to determine whether relator has suffered definite hearing loss as a result of the work-related injury. There is no medical evidence in the record that relator's ears are impaired. Instead, as the commission found in relying on Ortega's reports, the problem is that because of the anoxic brain damage, any auditory sensation which enters the ear cannot reach the brain, not because his ears are malfunctioning, but because of the anoxic brain damage.

{¶ 66} Relator argues, in part, that just as the anoxic brain damage caused a total loss of use of both of relator's arms and legs resulting in a loss-of-use award, any further loss (i.e., to vision or hearing), which is also due to anoxic brain damage, should result in a total-loss-of-use award. The problem with relator's argument is that the standard applied for loss of vision and hearing is different from that applied for loss of arms and legs. There was medical evidence in the record that supported the finding that relator had for all practical purposes lost the use of both arms and both legs. Unfortunately, because neither his vision nor his hearing can be tested, the medical evidence simply does not support a finding that he has permanent loss of vision nor that he has permanent and total loss of hearing. The commission did not abuse its discretion when it made this determination.

---

2. Taber's Cyclopedic Medical Dictionary (20th Ed. 2005) defines "efferent" as "[c]arrying away from a central organ or section, as efferent nerves, which conduct impulses from the brain or spinal cord to the periphery."

{¶ 67} At oral argument, counsel for relator argued that it is inconceivable that a man in a vegetative state can be denied an award for loss of vision and hearing simply because his loss cannot be established by medical or clinical findings. Counsel cited *State ex rel. Lockheed Martin Corp. v. Channell,* 10th Dist. No. 05AP–311, 2006-Ohio-215, 2006 WL 158629, in support, arguing that both hearing and sight encompass an ability to comprehend, which relator lacks. Counsel urges this court to apply the principles from *Lockheed Martin* here. For the reasons that follow, the magistrate finds that the facts in *Lockheed Martin* are not analogous to the facts here.

{¶ 68} In *Lockheed Martin,* Donald L. Channell's claim was allowed for " 'cranial concussion disorder; inner ear concussion disorders' as well as other conditions." *Id.* at ¶ 6. Channell moved for R.C. 4123.57(B) compensation for total loss of hearing in his right ear. In support, Channell submitted the August 23, 2004 letter from Gordon B. Hughes, M.D., a specialist in otology and neurotology. The letter provided:

Mr. Donald Channell has total deafness in his right ear which is permanent and is the direct result of an injury he sustained on October 27, 2001. Attached please find a copy of his hearing test. * * *

* * * The attachment to Dr. Hughes' letter is an eight-page document charting and reporting the results of auditory testing performed by audiologist Suzanne Kornhass, Au.D., on July 22, 2002.

On the first page of the document, Ms. [Kornhass] wrote in her own hand:

Hx [History]: [Patient] reports continuous feeling of being "off-balance" since Oct/01 following a fall and loss of consciousness.

Results: AS [auris sinistra or left ear] Hearing WNL [within normal limits] w[ith] excellent word rec[ognition] ability.

AD [auris dextra or right ear] Moderately severe SNHL [sensorineural hearing loss] w[ith] very poor word recognition ability.

*Id.* at ¶ 7–9.

{¶ 69} The commission awarded Channell compensation for total loss of hearing. The employer, Lockheed Martin, filed a mandamus action in this court. The issue was whether Dr. Hughes's letter, along with the audiologist's report, constituted some evidence. This court found that it did.

{¶ 70} Citing both *State ex rel. Sheller–Globe Corp. v. Indus. Comm.* (1981), 66 Ohio St.2d 51, 419 N.E.2d 1084, and *Kingry v. Indus. Comm.* (Apr. 2, 1985), 10th Dist. No. 84AP–109, 1985 WL 9920, this court stated:

As decided by Judge Whiteside in *Sheller–Globe,* in order to understand the true meaning of the words "total loss of hearing" it is essential to focus on the meaning of the word "hearing." Hearing, within the context of the statute,

means not just the ability to discern sounds, but, also, the ability to comprehend and give meaning to the sounds. Therefore, an inability to comprehend the spoken word for purposes of communication represents a total loss of hearing. It matters little that a person is able to discern certain sounds of certain frequencies at certain intensities if it is ascertained that the person is unable to hear and comprehend the spoken word.

\* \* \*

According to relator, the audiologist's finding that claimant has "moderately severe" hearing loss with "very poor word recognition ability," implies that claimant has "at least some word recognition ability and the ability to hear at least some sound." (Relator's brief at 3–4.) On that basis, relator concludes that the audiologist's finding is inconsistent with Dr. Hughes' opinion relied upon to support the commission's finding of total loss of hearing. The magistrate disagrees with relator's argument.

To begin, contrary to relator's assertion, the audiologist's finding of "very poor word recognition ability" does not necessarily equate to a finding that claimant has "some" word recognition ability. The audiologist never said that claimant has "some" word recognition ability in the right ear. Again, what the audiologist said is that the claimant has "very poor word recognition ability."

Moreover, even if it could be argued that the audiologist's finding implies that claimant can recognize some words with his right ear, that would not negate "an inability to comprehend the spoken word for purposes of communication" which, according to the *Kingry* court, represents a total loss of hearing.

In effect, the audiologist's report indicates that claimant has totally lost the ability to communicate with the use of his right ear. That is equatable to a total loss of hearing of the right ear regardless of any residual ability to hear sounds with the ear.

*Id.* at ¶ 22–26. It is upon the above language that counsel relies.

{¶ 71} The problem with counsel's argument is that he ignores the fact that in *Lockheed Martin,* the commission had medical evidence of the results of auditory testing. Here, there is no medical evidence demonstrating a loss of either vision or hearing, only a loss of response. The medical evidence supports the commission's order.

{¶ 72} Relator also argues that Ortega's reports are contradictory. In *State ex rel. Eberhardt v. Flxible Corp.* (1994), 70 Ohio St.3d 649, 657, 640 N.E.2d 815, the Supreme Court of Ohio summarized the distinction between the ambiguous, equivocal, and repudiated reports, as follows:

[E]quivocal medical opinions are not evidence. See, also, *State ex rel. Woodard v. Frigidaire Div., Gen. Motors Corp.* (1985), 18 Ohio St.3d 110 [480 N.E.2d

403] * * *. Such opinions are of no probative value. Further, equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Ambiguous statements, however, are considered equivocal only while they are unclarified. [*State ex rel. Paragon v. Indus. Comm.* (1983), 5 Ohio St.3d 72, 448 N.E.2d 1372.] Thus, once clarified, such statements fall outside the boundaries of [*State ex rel. Jennings v. Indus. Comm.* (1982), 1 Ohio St.3d 101, 438 N.E.2d 420], and its progeny.

Moreover, ambiguous statements are inherently different from those that are repudiated, contradictory or uncertain. Repudiated, contradictory or uncertain statements reveal that the doctor is not sure what he means and, therefore, they are inherently unreliable. Such statements relate to the doctor's position on a critical issue. Ambiguous statements, however, merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Such statements do not relate to the doctor's position, but to his communication skills. If we were to hold that clarified statements, because previously ambiguous, are subject to *Jennings* or to commission rejection, we would effectively allow the commission to put words into a doctor's mouth or, worse, discount a truly probative opinion. Under such a view, any doctor's opinion could be disregarded merely because he failed on a single occasion to employ precise terminology. In a word, once an ambiguity, always an ambiguity. This court cannot countenance such an exclusion of probative evidence.

{¶ 73} Relator contends that Dr. Ortega's reports were contradictory. Relator contends that Ortega's July 23, 2009 report supports his motion for loss of use of vision and hearing while his August 26, 2009 report indicates the award should be denied. However, the magistrate disagrees.

{¶ 74} While Ortega indicated in his August 26, 2009 report that the conditions were caused by a flow-through injury, he opined that the conditions were part of the anoxic brain damage. Further, he opined that within a reasonable degree of medical probability, the request for the additional allowance for bilateral vision loss and bilateral hearing loss should be denied because these losses have already been included in the allowed conditions of anoxic brain damage and seizure disorder. Contrary to relator's arguments, this report does not support his motion. Further, the reports are neither contradictory nor equivocal. In both reports, Ortega opined that any loss of vision and hearing was caused by the anoxic brain damage. In both reports, Ortega noted that relator's optic nerves were intact. Ortega's opinion in both reports was consistent.

{¶ 75} Relator then contends that the BWC prompted Dr. Ortega to issue a report clearly opposing the allowance. Relator is referring to the August 26,

2009 report of Ortega, which followed a conversation with someone at the BWC. It was then that Ortega stated that there was no reliable physical test or examination that could be conducted to determine whether relator suffered definite vision and hearing loss and that relator did not respond to any testing of the visual or hearing senses because of his anoxic brain damage.

{¶ 76} First, the magistrate has already determined that these reports are not contradictory. In both reports, Ortega indicated that any loss of vision or loss of hearing is caused by the anoxic brain damage and is already included in that allowance. Second, it is undisputed that relator's optic nerves are intact and presumably work. Even Dr. Hess acknowledged that relator's optic nerves are intact. Again, the problem is not that his eyes or ears are not functioning; the problem is that the anoxic brain damage interferes with the signals and relator cannot process them in a meaningful way. Third, there is no evidence that relator raised this issue administratively. Ordinarily, reviewing courts do not consider errors that the complaining party could have raised, but did not, at a time when it could be corrected. *State ex rel. Quarto Mining Co. v. Foreman* (1997), 79 Ohio St.3d 78, 679 N.E.2d 706.

{¶ 77} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it determined that relator did not establish that he had sustained a total loss of use of both eyes and both ears and this court should deny relator's request for a writ of mandamus.